**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**LARRY HEFLIN,**

        **Plaintiff,**

-vs-                                                                              Case No.  6:06-cv-111-Orl-22DAB

**COMMISSIONER OF SOCIAL SECURITY,**

_____

## MEMORANDUM OPINION & ORDER

The Plaintiff brings this action pursuant to the Social Security Act (the Act), as amended, Title 42 United States Code Section 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner) denying his claim for Disability Insurance Benefits (DIB), Childhood Disability Benefits (Disabled Adult Child), and Supplemental Security Income (SSI) benefits under the Act.

The record has been reviewed, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and the administrative record, and the pleadings and memoranda submitted by the parties in this case. Oral argument has not been requested.

For the reasons that follow, the decision of the Commissioner is **AFFIRMED**.

### *I. BACKGROUND*

**A.   Procedural History**

Plaintiff filed for a period of disability, DIB and SSI benefits on May 15, 2001. R. 104-05, 436-38. He alleged an onset of disability on February 14, 1989, due to residual pain and limitations

stemming from a cervical disc herniation, back pain, hypertension, headaches, residuals from amputation of the left leg including irritations from prosthesis, depression and anxiety. R. 40-41, 120. His application was denied initially and upon reconsideration. R. 5, 9. Plaintiff requested a hearing, which was held on February 16, 2005, before Administrative Law Judge James R. Russell (hereinafter referred to as "ALJ"). R. 34-62. In a decision dated September 22, 2005, the ALJ found Plaintiff not disabled as defined under the Act through the date of his decision. R. 21-23. Plaintiff timely filed a Request for Review of the ALJ's decision. R. 460-62. The Appeals Council denied Plaintiff's request on November 25, 2005. R. 5-7. Plaintiff filed this action for judicial review on January 26, 2006. Doc. No. 1.

### B. Medical History and Findings Summary

Plaintiff, who was born in 1968, was 37 years old when the ALJ issued his decision R. 22, 104, 438. Plaintiff has a ninth grade "limited" education, and has past work experience as a courier, merchandise deliverer, spray painter, carpet cleaner, motor vehicle dispatcher, automobile detailer and parking lot attendant. R. 13, 121, 129. Plaintiff also testified that he had been in prison since May 2003 for charges related to trafficking cocaine and he had been incarcerated on drug charges twice before. R. 41, 46-47. Although Plaintiff had been incarcerated since May 2003 for drug trafficking, he was able to provide testimony through the telephone for the hearing. R. 13, 41.

Plaintiff's medical history is set forth in detail in the ALJ's decision. By way of summary, Plaintiff complained of back pain, hypertension, headaches, residuals from amputation of the left leg in 1985, including irritations from prosthesis, depression and anxiety. R. 13, 40-41, 120. After reviewing Plaintiff's medical records and Plaintiff's testimony, the ALJ found that Plaintiff had a history of left leg amputation with stump irritation from the prosthesis, neck and back pain associated

with degenerative disc disease and a herniated nucleus pulposus at the C5-C6 disc level, controlled hypertension, occasional headaches, depression and anxiety, which were "severe" medically determinable impairments, but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  R. 14.  The ALJ determined that Plaintiff had the residual functional capacity (RFC) for a significant range of light work; he could lift and/or carry and push/pull 20 pounds occasionally and 10 pounds frequently; stand and/or walk for approximately two hours out of an eight-hour day and sit for approximately six hours out of an eight hour day; he could use his arms and hands for routine grasping, holding and turning objects without limitation; he could perform occasional balancing, stooping, kneeling, crouching and crawling and he needed to avoid concentrated exposure to hazardous work areas.  R. 19; 22, Finding Nos. 7 and 12.  The ALJ also found that Plaintiff had moderate limitations concerning his capacity for understanding and carrying out detailed instructions and maintaining concentration for prolonged periods.  R. 19.  In making this determination, the ALJ found that Plaintiff's allegations regarding his limitations were not totally entirely credible for the reasons set forth in the body of the decision.[1]  R. 15.

The ALJ determined that Plaintiff had no past relevant work in that he had earned money from drug trafficking since February 14, 1999.  R. 14.  The ALJ then relied on VE testimony to establish the existence of a significant number of jobs in the national economy that Plaintiff could perform.  R. 21; 22, Finding No. 13.  Accordingly, the ALJ determined that Plaintiff was not under a disability, as defined in the Act, at any time through the date of the decision.  R. 21.

---

[1] Within the body of the decision, the ALJ discredited Plaintiff's reported limitations based on several specific inconsistencies between those limits, the medical history, the reports of treating and examining practitioners, the degree of medical treatment required and the claimant's own description of his activities and life style.  R. 15.

Plaintiff asserts that the ALJ erred by failing to address Plaintiff's assertion that he is unable to wear his prosthesis for prolonged periods of time. Plaintiff argues in the alternative that the ALJ erred by failing to adequately analyze and discuss whether the Plaintiff met or equaled listing 1.05(B). Plaintiff also implicitly argues that the ALJ erred in evaluating his credibility concerning the pain and limitations from wearing his prosthesis for prolonged periods. For the reasons that follow, the decision of the Commissioner is **AFFIRMED**.

## *II. STANDARD OF REVIEW*

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – *i.e.,* the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson*, 402 U.S. at 401).

"If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004). "We may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner.]" *Id.* (internal quotation and citation omitted); *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery*

*v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, he is not disabled. 29 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, he is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent her from doing other work that exists in the national economy, then he is disabled. 20 C.F.R. § 404.1520(f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having severe hypothetical and isolated illnesses. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of the combination of impairments when determining whether an individual is disabled. *Id.*

The listing of impairments in the Social Security Regulations identifies impairments which are considered severe enough to prevent a person from gainful activity. By meeting a listed impairment or otherwise establishing an equivalence, a Plaintiff is presumptively determined to be

disabled regardless of his age, education, or work experience. Thus, an ALJ's sequential evaluation of a claim ends if the claimant can establish the existence of a listed impairment. *Edwards v. Heckler*, 736 F.2d 625, 628 (11th Cir. 1984). However, at this stage of the evaluation process, the burden is on the plaintiff to prove that he is disabled. *Bell v. Bowen*, 796 F.2d 1350, 1352 (11th Cir. 1986); *Wilkinson v. Bowen*, 847 F.2d 660, 663 (11th Cir. 1987). In this circuit, a plaintiff must present specific findings that meet the various tests listed under the applicable listing. *Bell*, 796 F.2d at 1353. Mere diagnosis of a listed impairment is not enough as the record must contain corroborative medical evidence supported by clinical and laboratory findings. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).

Plaintiff does not dispute that he must establish disability on or before September 30, 1989, the date he last met the earnings requirements for disability insurance benefits under Title II of the Social Security Act, and on or before March 25, 1990, the day he attained age 22 for childhood disability benefits under Title II of the Act. R. 13; R. 21, Finding No. 1.

### *III. ANALYSIS*

**A. Broken prosthesis does not meet the Listing**

The ALJ found that the Plaintiff had a history of left leg amputation with stump irritation from the prosthesis. T. 22, Finding 4. Plaintiff contends that the ALJ erred in failing to address Plaintiff's assertion that he is unable to wear his prostheses for prolonged periods of time. The ALJ also found Plaintiff did not meet one of the listed impairments contained in Appendix 1, Subpart P, Regulations 4. R. 15. Plaintiff contends the ALJ erred in failing to specify why Plaintiff did not meet the requirements of Listing 1.05(B). Plaintiff argues that his unrefuted testimony is that he is only able to use his prosthesis for four hours per day due to stump complications supports his theory that he

meets Listing 1.05(B) and should be found *per se* disabled, despite vocational expert testimony to the contrary. Doc. No. 22 at 13. The Commissioner responds that there is insufficient documented medical evidence that Plaintiff's prosthesis caused him significant problems from rubbing his stump and that Plaintiff is able to ambulate effectively as contemplated in the Listing of Impairments, thus, he has not shown that he meets or equals the requirements for presumptive disability under Listing 1.05B.

It is up to the plaintiff to present specific findings that meet the various tests listed under the applicable listing. *Bell*, 796 F.2d at 1353. Mere diagnosis of a listed impairment is not enough as the record must contain corroborative medical evidence supported by clinical and laboratory findings. *Carnes*, 936 F.2d at 1218. Listing 1.05(B) provides that a person is "per se" disabled if he has an amputation of one or both lower extremities at or above the tarsal region, with stump complications resulting in medical inability to use a prosthetic device to ambulate effectively, as defined in 1.00B2b(2), which has lasted or are expected to last at least 12 months.

1.00B2b(2) provides as follows:

> *To ambulate effectively*, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

The listing further provides as to Prosthetic devices:

> Examination should be with the prosthetic device in place. In amputations involving a lower extremity or extremities, it is unnecessary to evaluate the individual's ability

>to walk without the prosthesis in place. However, the individual's medical ability to use a prosthesis to ambulate effectively, as defined in 1.00B2b, should be evaluated. The condition of the stump should be evaluated without the prosthesis in place.

Plaintiff relies on his testimony that he cannot spend more than four hours with his prosthesis on as evidence that he meets the Listing criteria. Plaintiff testified that he lost his leg in a motorcycle accident when he was sixteen years old. R. 39. Plaintiff also testified that with his prosthesis on he can only stand for 15 to 20 minutes and sit for 30 minutes; he wears his prosthesis for half a day and spend the other half on crutches and need to alternate between sitting and standing every couple of hours. R. 41-42. Plaintiff further testified that if he had a job that was primarily sitting with no walking, he could probably wear his prosthesis for four to five hours. R. 45. Plaintiff testified that when tried to work in prison, his prosthesis would rub raw and his stump would get sore. R. 45. Plaintiff also testified that he had been trying to get a better fitting prosthesis and had been to the prison brace clinic several times; he was issued crutches due to the fact that he could not wear the leg. R. 45.

The Commissioner points out that, as noted by the ALJ, Plaintiff returned to full time work after his below the knee amputation of his left leg and had no change of his medical condition associated with his alleged onset date. R. 15. The medical records bear this out as there was sparse treatment, and it was mostly for complaints related to back and neck pain, chest pain, headaches, hypertension and anxiety, rather than for any complaints related to his prosthesis. R. 14-19, 168, 169-79, 180-89, 190-99, 209-41. There are almost no medical records for the period before the late 1990s and there are no records going back to February 1989, the alleged onset date. Plaintiff testified that after his amputation, he had worked cleaning carpets and also had worked for about four months in 2000 as a courier delivering blueprints and legal packages. R. 39, 49-50. Plaintiff also worked as a

car lot employee cleaning and transporting cars, and as a furniture painter. R. 121. As the ALJ noted, Plaintiff admitted that prior to his arrest, he typically spent twenty to thirty hours per week selling drugs. R. 19, 46-49. Plaintiff's ability to engage in work activity indicates that his condition was not as limiting as he claimed.

Prior to his time in prison, the only mention of pain in Plaintiff's leg is following a car accident in March 2000, when Dr. Richard Carino's notes Plaintiff's complaints of left leg pain in conjunction with low back pain and neck pain. R. 235. Plaintiff's job duties, including lifting up to 165 pounds and frequent, walking, bending, and lifting aggravated his injury. R. 235. Dr. Carino noted "neuropathy on [left] leg acting up" in August 2000, but this had decreased by September 2000. R. 229-30. In November 2000, Plaintiff was back at his courier job. R. 227-28.

In an October 2001 consultative examination, Dr. Robert Burchett's notes revealed that Plaintiff had a left below the knee amputation and used an artificial leg, but there was no evidence of varicosity, edema, ulcers, discoloration or contractures of muscles noted in the lower extremities. R. 205-06. Dr. Burchett noted that Plaintiff was not able to deep knee bend, walk on his heels or toes, hop or squat half way to the floor, and his tandem walk was basically nonexistent, but there was no mention of Plaintiff's prosthesis not fitting properly. R. 206. Plaintiff had a relatively normal ambulation, could get on and off the examination table and arise from a chair fairly easily, and had normal strength without atrophy, and Dr. Burchett specifically mentioned that Plaintiff did not need an assistive device other than his artificial leg. R. 205-06. Medical records from November 2001 to April 2003 with Dr. Rosetta Cannata also fail to show complaints of any problems with the fit of Plaintiff's prosthesis, but mention only Plaintiff's complaints of low back pain, hypertension, and anxiety with one exception. R. 310-26. On March 12, 2003, Plaintiff complained that his prosthesis

was wearing out and, thus, he felt he was guarding when he walked. R. 311. Plaintiff did not complain of stump complications, that the prosthesis did not fit. The cause of Plaintiff's complaint was not the fit, it was the worn out prosthesis.

Following Plaintiff's incarceration two months later at Taylor Correctional Institute, Plaintiff began to complain regularly about his worn-out and broken prosthesis, which the prison authorities in the Brace Clinic did not appear able to adequately replace or repair to his satisfaction. R. 327-35. In July 2003, Plaintiff complained that his prosthesis did not fit *anymore* and that it had worn out because it was six years old. R. 396. In August 2003, Plaintiff broke the big toe of his prosthesis; he was placed on restricted activity and crutches and a new prosthesis was ordered. R. 394. Apparently, the six-year old prosthesis was not replaced with a new one because Plaintiff's records from nine months later[2], May 2004, state: "VS waived prosthesis problems. No open sores noted at this time. Foot part falling apart; toes falling off of it. Redness noted to side of stump, socks coming apart. R. 354. Plaintiff was referred to a different doctor for re-evaluation of the prosthesis brace and he was restricted to no work and use of crutches only for ten days. R. 353-54, 373. By June and July 2004, Plaintiff's prosthesis had broken in the foot area, like it had nine months before; and he was again referred to the Brace Clinic, this time for a "renewal" prosthesis. R. 348, 351-54, 399.

The prison process dragged on for several more months. In September 2004, the prison orthotist noted the Plaintiff's socket did not fit properly because by then the prosthetic foot had fallen apart and the prison doctor believed Plaintiff needed to be assessed for a new prosthesis; Plaintiff required evaluation by a specialist, an advanced prosthetics prosthetist, who would be available at the end of the month. R. 377, 401. On September 30, 2004, Plaintiff was seen in the brace clinic for

---

[2]It is interesting that medical records from March 2004 restrict Plaintiff to "no sports." R. 373.

-10-

fitting of the new prosthesis by the specialist, Dale Collins, LPO (Advance Brace Orthotics/Prosthetics), and he noted that, except for the broken foot, Plaintiff's current prosthesis was "fitted well." R. 378. He recommended that the foot be replaced and Plaintiff be provided with a supply of stump socks. R. 378.

In January 2005, Mr. Collins had to once again recommend a new foot to be safe and functional and socks to maintain the proper fit of the prosthesis for Plaintiff, when he noted that Plaintiff's prosthetic foot was worn out and was not safe. R. 376. A follow-up note dated January 13, 2005, indicates a new prosthesis was ordered and Plaintiff would be seen when it was ready. R. 331.

Plaintiff's attorney argued to the ALJ at the close of the hearing that the reason Plaintiff's prosthesis fit poorly and caused him pain was because Plaintiff received lesser quality treatment at the prison:

> Now, I understand the problems with the prison system in that the medical care there is not the same as it is on the outside. If he was on the outside and he had insurance, he might be able to get refitted for another prosthesis and he wouldn't have all these problems. But we have to take claimants as find them. And the situation is that, at least for the last few years, is he's having the stump complications due to, apparently, a poorly fitting prosthesis and rawness in the stump area.

R. 60-61. Plaintiff testified at the hearing that he had three to four different prosthesis in the span of about 20 years, from the time he was seventeen to the time of the hearing when he was thirty-seven; or a new prosthesis on average every five to six years. R. 13, 39-40. Plaintiff's prosthesis was worn out and required replacing in March 2003, before his incarceration began. During his incarceration, his prosthesis deteriorated further and the prison authorities delayed obtaining a new prosthesis for Plaintiff but eventually did order that a new foot be provided for him on January 12, 2005, one month

-11-

before his hearing before the ALJ on February 16, 2005 – a fact he did not disclose during the hearing. R. 45, 331, 376.

These records clearly reveal that Plaintiff had problems obtaining a fully functional prosthesis, but there is no indication that Plaintiff could not ambulate effectively if he had had a brand new prosthesis or because he was experiencing stump complications which made him unable to use any prosthetic device – he was clearly having problems, as any amputee would, ambulating on a worn-out prosthesis with a broken foot. Such problems are not expected to last for at least 12 months and did not meet the criteria for a listed impairment under § 1.05B. Moreover, Plaintiff testified that he expected to be release from prison in 2006 and presumably he would be able to obtain a new prosthesis at that time if the new foot provided by the prison was insufficient. Even under Plaintiff's theory that he developed stump complications while in prison through neglect of his prosthesis, there certainly was no evidence that Plaintiff had ambulation problems prior to September 30, 1989 or March 1990, the dates to qualify for disability insurance benefits through his own record or as a disabled adult child.

### B.   Subjective complaints and credibility.

Plaintiff implicitly asserts that the ALJ erred by failing to evaluate his allegations of pain from his prosthesis. The Plaintiff argues that because the Administrative Law Judge did not reject the Plaintiff's complaints regarding his inability to wear his prosthesis for prolonged periods of time, his testimony should be deemed true as a matter of law.

Although the ALJ did not refer to the Eleventh Circuit's pain standard as such, he clearly was aware of the governing standards for evaluating subjective complaints because he cited the applicable regulations and Social Security Ruling ("SSR") 96-7p. R. 14. *See Wilson v. Barnhart*, 284 F.3d

1219, 1225-26 (11th Cir. 2002) (per curiam) (ALJ properly applied the Eleventh Circuit pain standard even though he did not "cite or refer to the language of the three-part test" as "his findings and discussion indicate that the standard was applied"). Moreover, the ALJ complied with those standards. He obviously determined that plaintiff had an objective medical condition that could give rise to the alleged symptoms, because otherwise the ALJ would not be required to assess the credibility of the alleged complaints.

Having concluded that he had to make a credibility determination of Plaintiff's subjective complaints, the ALJ plainly recognized that he had to articulate a reasonable basis for his determination. In that respect, immediately before discussing Plaintiff's RFC, the ALJ stated,

> The claimant's statements concerning his impairments and their impact on his ability to work are not entirely credible in light of the medical history, the reports of treating and examining practitioners, the degree of medical treatment required and the claimant's own description of his activities and lifestyle. While the claimant reported that he has to lie down periodically each day to relieve his pain, there is no indication from the treatment records that he was ever advised by a treating source to lie down in order to relieve pain. Nor has he ever told a treating physician that his symptoms (including pain) required him to lie down periodically throughout the day to relieve the pain. Thus there is no medically supported reason found for this self-prescribed treatment.
>
> The objective medical evidence of record does not establish the severity of impairments alleged by the claimant. The evidence does not indicate that the claimant's physical and mental impairments would have prevented the performance of a significant range of light exertional level work during the claimant's alleged period of disability. . . .
>
> After the hearing, the claimant's attorney submitted the most recent treatment records from the Taylor Correctional Facility which cover the period [from] July 2003 through March 4, 2005. These records show that the claimant's prosthesis has been adjusted to prevent unwanted "rubbing." While the claimant has reported to sick call on several different occasions since being incarcerated, these records fail to show any significant long-term problems with the prosthesis or concerning the claimant's alleged neck and back pain.

R. 15, 17. When an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Jones v. Dep't of Health and Human Servs.*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. *Foote*, 67 F.3d at 1561-62; *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

As the Court has already discussed above at length, the prison health care records do not establish that Plaintiff was unable to ambulate due to a permanently disabling condition, but simply because his prosthesis, or at least the foot, had worn out and required replacement. Mr. Collins, the advanced prosthetic prosthetist, opined that Plaintiff's current prosthesis fit well, but Plaintiff required stump socks. R. 378. Here, the ALJ offered specific reasons for discrediting Plaintiff's subjective complaints. The ALJ's reasons were inconsistencies between Plaintiff's testimony and the prison medical records, which are factors the ALJ is directed to consider. 20 C.F.R. §§ 404.1529; 416.929. The ALJ's determination that Plaintiff's medical records failed to support any significant long-term problems with the prosthesis is supported by substantial evidence.

### *IV. CONCLUSION*

For the reasons set forth above, the ALJ's decision is consistent with the requirements of law and is supported by substantial evidence. Accordingly, the Court **AFFIRMS** the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on February 26, 2007.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

-15-

Copies furnished to:
Counsel of Record